## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| ROBERT S. BEREZANSKY, | ) | Case No. 3:17-cv-105 |
|---|---|---|
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| CNB BANK AND CNB FINANCIAL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I. Introduction

Pending before the Court is Defendants CNB Bank and CNB Financial Corporation's (collectively, "Defendants" or "CNB") Motion for Summary Judgment (ECF No. 32) on Plaintiff Robert Berezansky's retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955, as well as Plaintiff's age discrimination claim under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* The Motion is fully briefed (ECF Nos. 33, 34, 35, 38, 39, 40, 41, 42, 39, 44, 45, 46, 47) and ripe for disposition. For the reasons that follow, the Court will grant Defendants' motion in part and deny it in part.

### II. Jurisdiction

This Court has subject-matter jurisdiction because Plaintiff's Title VII and ADEA claims arise under federal law. 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over Plaintiff's PHRA claim because Plaintiff's PHRA claim "form[s] part of the same case or controversy" as the Title VII and ADEA claims. 28 U.S.C. § 1367. Venue is proper because a

substantial part of the events giving rise to Plaintiff's claims occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391(b)(2).

## III.   Factual Background[1]

### A.   The Johnstown Office

This employment discrimination case arises from alleged acts of retaliation and age discrimination taken by CNB against Plaintiff.[2] (ECF No. 34 ¶ 1; ECF No. 40 ¶ 1.) CNB employed Plaintiff as Vice President of Commercial Lending at CNB's Johnstown, Pennsylvania office (the "Johnstown Office"), and Plaintiff was responsible for both management and loan production in the Johnstown Office. (ECF No. 34 ¶ 2–3; ECF No. 40 ¶¶ 2–3, 102; ECF No. 44 ¶ 102.) In December of 2007, CNB promoted Plaintiff to Senior Vice President of Commercial Lending. (ECF No. 40 ¶ 103; ECF No. 44 ¶ 103.) CNB established the Johnstown Office for the purpose of commercial lending, but the office was not considered a branch, and it did not produce wealth and asset management and trust business. (ECF No. 34 ¶ 4; ECF No. 40 ¶ 4.) Plaintiff essentially developed the Johnstown Office, as CNB did not have a branch there prior to hiring Plaintiff. (ECF No. 40 ¶ 104; ECF No. 44 ¶ 104.) As part of his position in the Johnstown Office, Plaintiff hired employees for that office; employees he hired include, among others, Jennifer Mowery, Joyce Waterhouse Czyrnik, and Deborah Peak. (ECF No. 34 ¶ 5; ECF No. 40 ¶ 5.) As part of his job duties, Plaintiff

---

[1] The Court derives these facts from a combination of Defendants' Concise Statement of Material Facts (ECF No. 34), Plaintiff's Response in Opposition to Defendants' Concise Statement of Material Facts (ECF No. 40), and Defendants' Reply to Plaintiff's Response to Concise Statement of Material Facts (ECF No. 44). Unless otherwise noted, these facts are undisputed. Much of the basis for the Parties' statements of material facts comes from deposition testimony from persons involved with the events leading to this case.

[2] Plaintiff has consented, in his responses to Defendants' Motion to this Court's dismissal of the ADEA claim. Accordingly, this Court will not consider the claim further, and its statement of the facts will omit any portions of the record solely relevant to that now dismissed claim.

supervised and reviewed the performance of all employees in the Johnstown Office. (ECF No. 34 ¶ 10; ECF No. 40 ¶ 10.) Ms. Mowery, Ms. Czyrnik, and Ms. Peak all reported directly to Plaintiff. (ECF No. 34 ¶¶ 7–9; ECF No. 40 ¶¶ 7–9.) As of 2011, the Johnstown Office "probably" had CNB's largest loan portfolio for "fee income." (ECF No. 40 ¶106; ECF No. 44 ¶ 106.)

From the time Plaintiff first began working for CNB until January 1, 2010, Plaintiff's supervisor was Bill Falger, President of CNB. (ECF No. 34 ¶¶ 11–14; ECF No. 40 ¶¶ 11–14.) On January 1, 2010, Joseph Bower became President and CEO of CNB, having previously served as both COO and CFO of CNB. (ECF No. 34 ¶ 14; ECF No. 40 ¶ 14.) Bower and Plaintiff had a "strained" relationship. (ECF No. 34 ¶ 15; ECF No. 40 ¶ 15.) Bower had a different lending philosophy than Falger, which focused on more conservative loans that were closer to "home" rather than further afield. (ECF No. 34 ¶¶ 16–17; ECF No. 40 ¶¶ 16–17.) The parties dispute the contention CNB's lending philosophy was growing more conservative generally, or if it was simply Bower's; Plaintiff testified that loans over a certain size needed approval from the Loan Committee, of which Bower was a member—neither the loan officer nor the President had sole authority to approve those loans. (ECF No. 34 ¶¶ 15–17; ECF No. 40 ¶¶ 15–17.) Bower testified in his deposition that he instructed Plaintiff to increase his lending in the areas of manufacturing and small business in the Johnstown area, and away from lending in areas like West Virginia and Philadelphia. (ECF No. 34 ¶ 19; ECF No. 40 ¶ 19.) During Bower's time as President, the Johnstown Office failed to meet its production goals. (ECF No. 34 ¶ 20; ECF No. 40 ¶ 20.)

It is undisputed that the Johnstown Office's loan portfolio was initially "very good," but the parties dispute if its quality decreased while Plaintiff ran the office. (ECF No. 34 ¶ 22; ECF No. 40 ¶ 22.) In addition, the parties dispute whether loans in Plaintiff's portfolio resulted in

3

"charge-offs,"[3] and whether Plaintiff made a loan which he was specifically instructed not to make. (ECF No. 34 ¶ 23; ECF No. 40 ¶ 23.) As a result of a "cultural change" in lending at CNB, Bower asked Plaintiff to prepare a plan to increase the Johnstown Office's small business lending; Bower reviewed it, but apparently did not approve it, though there is no evidence that he disapproved it. (ECF No. 34 ¶ 27; ECF No. 40 ¶ 27.)

Bower believed that Plaintiff showed a lack of knowledge during loan presentations and that he had been holding back information on credits and loan applications he passed to CNB; Plaintiff disputes these allegations. (ECF No. 34 ¶ 30; ECF No. 40 ¶ 30.) Bower also allegedly confronted Plaintiff about holding back this information, after which Plaintiff "fired back" with allegations of disparate treatment; Plaintiff denies such a confrontation ever occurred. (ECF No. 34 ¶ 31; ECF No. 40 ¶ 31.) Bower instructed Plaintiff not to interact with a particular customer; Plaintiff disregarded this instruction, and maintained a business relationship with the loan customer, who was in default. (ECF No. 34 ¶¶ 32–33; ECF No. 40 ¶¶ 32–33.) Plaintiff alleges that Bower later gave him permission to interact with that customer again. (ECF No. 34 ¶ 33; ECF No. 40 ¶ 33.)

---

[3] The parties do not define for this Court what a "charge-off" is, but it appears to be a "debt . . . that is deemed unlikely to be collected by the creditor because the borrower has become substantially delinquent after a period of time." *Charge-Off*, Investopedia, https://www.investopedia.com/terms/c/chargeoff.asp (last visited Sep. 25, 2019). The Court believes that CNB mentions these as evidence that the Plaintiff recommended or made bad loans, or was deficient in his performance because these "charge-offs" resulted.

4

## B. Plaintiff's Claims of Disparate Treatment

CNB has a Productive Work Environment Policy that forbids all forms of harassment and discrimination. (ECF No. 34 ¶ 34; ECF No. 40 ¶ 34.) At some point before his termination,[4] Plaintiff spoke to Bower about disparate treatment of female employees at the Johnstown Office; these allegations included people "staring" at women, looking down blouses, and looking up dresses. (ECF No. 34 ¶¶ 35-36; ECF No. 40 ¶¶ 35-36.) Plaintiff also allegedly spoke to Bower about how female lenders were not invited to golf outings, and Ms. Mowery claims that the female employees were told "they could drive the beer cart," but couldn't golf with the men. (ECF No. 34 ¶ 37; ECF No. 40 ¶ 37.) During one such golf outing, Bower allegedly urinated in front of several female employees. (ECF No. 40 ¶ 37.) Bower recalled having two conversations with Plaintiff about unfair treatment of female employees, but does not recall Plaintiff being able to provide specifics regarding alleged disparate treatment; Plaintiff disputes these claims. (ECF No. 34 ¶¶ 41-42; ECF No. 40 ¶¶ 41-42.). On May 19, 2011, Ms. Mowery was disciplined for raising her voice during a telephone call with Mark Breakey, the head of CNB's credit department; the alteration allegedly included Mr. Breakey being "rude and nasty," calling Ms. Mowery "an MF," and both parties "los[ing] it." (ECF No. 34 ¶¶ 38-39; ECF No. 40 ¶¶ 38-39.)

The parties dispute the testimony regarding the disparate treatment the female employees suffered. (ECF No. 34 ¶ 43; ECF No. 40 ¶ 43.) Ms. Czyrnik and Ms. Mowery may have complained about various activities of senior management, but Ms. Czyrnik does not remember "who said what," or any specific complaints. (ECF No. 34 ¶ 43; ECF No. 40 ¶ 43; ECF No. 44 ¶

---

[4] Plaintiff claims that it was less than a month; both parties agree it was sometime between 2009 and 2011. (ECF No. 34 ¶ 35; ECF No. 40 ¶ 35.)

43.) Ms. Czyrnik does not recall if she ever complained to Plaintiff of harassment or disparate treatment, but she does recall discussions regarding senior management treating women in a way that made them uncomfortable; she also recalls that she personally did not feel uncomfortable with how male colleagues treated her. (ECF No. 34 ¶ 44; ECF No. 40 ¶ 44.)

Plaintiff alleges that the female employees were underpaid, but Bower does not recall having any conversations with Plaintiff regarding salary, and Plaintiff had no salary data. (ECF No. 34 ¶ 45; ECF No. 40 ¶ 45.) In addition, Ms. Czyrnik felt she was fairly compensated for her work at CNB. (ECF No. 34 ¶46; ECF No. 40 ¶ 46.) Plaintiff's complaints particularly related to Ms. Mowery, who had been awarded lender of the year, but Plaintiff believed that she was one of the lowest paid lenders; Ms. Mowery does not recall ever complaining about her compensation. (ECF No. 40 ¶ 115; ECF No. 44 ¶ 115.) Plaintiff did, however, recall having conversations with Mr. Breakey regarding employee compensation. (ECF No. 40 ¶ 46; ECF No. 44 ¶ 46.) Despite any potential complaints, both Ms. Peak and Ms. Czyrnik felt that the Johnstown Office was a good place to work, with the exception of Plaintiff's relationship with Ms. Mowery. (ECF No. 34 ¶¶ 47–48; ECF No. 40 ¶¶ 47–48.)

## C. Plaintiff's Relationship with Ms. Mowery

While Plaintiff and Ms. Mowery worked together at the Johnstown Office, they had a physical and romantic relationship that went "too far." (ECF No. 34 ¶ 49; ECF No. 40 ¶ 49.) Plaintiff admitted that he allocated more time for Ms. Mowery than he did for his other employees, and that Bower approached him with concerns regarding the relationship. (ECF No. 34 ¶¶ 50–51; ECF No. 40 ¶¶ 50–51.) Ms. Mowery's office behavior deteriorated during her relationship with Plaintiff, causing Ms. Peak to feel unsafe around Ms. Mowery. (ECF No. 34 ¶

6

52; ECF No. 40 ¶ 52.) Ms. Peak related her unhappiness with Ms. Mowery's relationship with Plaintiff to Plaintiff, and she felt Plaintiff was more concerned with the relationship than with how the rest of the Johnstown Office felt. (ECF No. 34 ¶¶ 53–54; ECF No. 40 ¶¶ 53–54.) After the relationship between Plaintiff and Ms. Mowery was no longer secret, Ms. Peak felt that Plaintiff treated Ms. Mowery preferentially by giving her more work than Ms. Czyrnik. (ECF No. 34 ¶¶ 55–57; ECF No. 40 ¶¶ 55–57.)

In addition, Ms. Peak recalled that Ms. Mowery and Plaintiff were often out of the office together, and that these absences were for "non-business related events." (ECF No. 34 ¶ 58; ECF No. 40 ¶ 58.) Plaintiff and Ms. Mowery traveled to Erie, Pennsylvania for a work event, and Plaintiff was instructed to take everyone in the Johnstown Office, but failed to do so; Plaintiff claims this was because there had to be people in the Johnstown Office. (ECF No. 34 ¶ 60; ECF No. 40 ¶ 60.) Ms. Peak recalls that Plaintiff threatened to fire her and Leigh Bolcho, another employee in the Johnstown Office if they were not nice to Ms. Mowery; Plaintiff denies ever making such a threat. (ECF No. 34 ¶ 62; ECF No. 40 ¶ 62.) Ms. Peak believed that the Johnstown Office began to develop a bad reputation as a result of Plaintiff's unavailability in the office and failure to return telephone calls. (ECF No. 34 ¶ 64; ECF No. 40 ¶ 64.) Ms. Peak also believed that Plaintiff and Ms. Mowery's relationship reflected poorly on the bank, and Ms. Czyrnik believed that the relationship had a negative impact on the work environment of the Johnstown Office. (ECF No. 34 ¶¶ 65–66; ECF No. 40 ¶¶ 65–66.) Ms. Czyrnik never saw Plaintiff try to alleviate the environment created by Ms. Mowery. (ECF No. 34 ¶ 75; ECF No. 40 ¶ 75.) Ms. Peak believed that Ms. Mowery behaved unprofessionally at work, was "unstable," would "blow up a lot," and

7

may have damaged Plaintiff's car; Plaintiff does not recall Ms. Mowery ever acting unprofessionally. (ECF No. 34 ¶¶ 67–69; ECF No. 40 ¶¶ 67–69.)

In April of 2011, Ms. Peak resigned her position at CNB, in part due to an "out of control" work environment caused by Plaintiff and Ms. Mowery's relationship. (ECF No. 34 ¶¶ 70–71; ECF No. 40 ¶¶ 70–71.) She later returned to CNB as a portfolio manager in CNB's Indiana, Pennsylvania office in July of 2011. (ECF No. 34 ¶ 94; ECF No. 40 ¶ 94.) Sometime in 2011, Ms. Czyrnik also resigned from the Johnstown Office, citing concerns with "how the Johnstown office is operating." (ECF No. 34 ¶ 74; ECF No. 40 ¶ 74.) CNB terminated Ms. Mowery on June 30, 2011, nominally for failing to follow direction from her superiors, but Plaintiff alleges that she was terminated because CNB's management was "jealous" of Plaintiff, and shortly after Plaintiff had told CNB's management that Ms. Mowery had "good grounds" for a discrimination charge. (ECF No. 34 ¶ 76; ECF No. 40 ¶ 76.)

## D. Plaintiff's Termination

On June 23, 2011, CNB terminated Plaintiff. (ECF No. 34 ¶ 77; ECF No. 40 ¶ 77.) The stated reasons were performance deficiency, insubordination, and poor relationships in the Johnstown Office; Plaintiff contends that the real reason was in retaliation for reporting disparate treatment, which Plaintiff asserts happened less than a month before his termination. (ECF No. 34 ¶ 77; ECF No. 40 ¶ 77.) Plaintiff's termination was carried out by Bower and Rick Sloppy, CNB's Senior Lender; Bower recalls that he discussed the termination with Mr. Sloppy, Mr. Breakey, and Rick Greslick, CNB's COO. (ECF No. 34 ¶¶ 76, 82; ECF No. 40 ¶¶ 76, 82.) At some point prior to Ms. Mowery's termination, she may have told a human resources employee of CNB that she was prepared to go complain to the EEOC; the parties dispute when this happened—

before or after Plaintiff's termination. (ECF No. 34 ¶ 79; ECF No. 40 ¶ 79.) Either at the time of Plaintiff's termination, or shortly after, CNB closed the Johnstown Office. (ECF No. 34 ¶ 80; ECF No. 40 ¶ 80.)

### E. Plaintiff's Post-CNB Employment

In 2011, at the time CNB terminated Plaintiff, his salary was $121,000. (ECF No. 34 ¶ 95; ECF No. 40 ¶ 95.) After his termination, Plaintiff entered negotiations with Somerset Trust about a position in their commercia lending division; the parties dispute if Somerset Trust ever offered Plaintiff the position—regardless, Plaintiff never began working for Somerset Trust. (ECF No. 34 ¶ 96; ECF No. 40 ¶ 96.) The parties also dispute the level of compensation Somerset Trust would have paid Plaintiff had he accepted the position. (ECF No. 34 ¶ 97; ECF No. 40 ¶ 97.) Plaintiff has not worked in the banking or lending industries since CNB terminated him. (ECF No. 40 ¶ 119; ECF No. 44 ¶ 119.) However, Plaintiff has worked at Home Depot for $10.00 per hour and at Richland Woods. (ECF No. 40 ¶ 120; ECF No. 44 ¶ 120.)

### IV. Procedural Background

Plaintiff filed his Complaint on June 21, 2017, alleging three claims: retaliation under Title VII and the PHRA, as well as age discrimination in violation of the ADEA. (ECF No. 1.) Defendants moved to strike portions of the Complaint on September 5, 2017, which the Court denied on January 17, 2018. (ECF Nos. 6, 20.) Defendants moved for summary judgment on April 1, 2019. (ECF No. 32.) Plaintiff responded on May 1, 2019, and consented to the dismissal of the ADEA claim. (ECF No. 38 at 10.) Accordingly, this Court must only consider Defendants' Motion with respect to the Title VII and PHRA claims.

9

## V. Legal Standard

This Court will grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than

10

a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## VI. Discussion

### A. The Parties' Arguments

Defendants argue that they are entitled to summary judgment on both Plaintiff's Title VII and PHRA claims because Plaintiff could not have reasonably believed that he was opposing a practice that either Title VII or the PHRA forbids. (ECF No. 33 at 13.) In addition, Defendants contend that Plaintiff cannot establish the necessary element of causation (and therefore, a *prima facie* case) for his retaliation claims because Plaintiff's claims of disparate treatment of women were made after CNB discussed Plaintiff's performance deficiencies. (*Id.*) Defendants further maintain that, even if Plaintiff could make out a *prima facie* case of retaliation, Defendants are nevertheless entitled to summary judgment because no reasonable jury could conclude that CNB terminated Plaintiff for anything other than legitimate, nondiscriminatory reasons. (*Id.*) Finally, Defendants assert that they are entitled to summary judgment on Plaintiff's claims for both back-pay and front-pay because Plaintiff failed to mitigate his damages by turning down a comparable job offer. (*Id.*).

Plaintiff responds that he has made a *prima facie* showing of his case because Plaintiff did hold an objectively reasonable belief that he was opposing disparate treatment, and CNB terminated Plaintiff less than a month after his complaints about disparate treatment to CNB's

11

management, which is sufficient to permit the jury to infer a causal connection. (ECF No. 39 at

7–13.) Plaintiff also argues that Defendants' proffered reasons for his termination are pretextual,

and that he has produced enough evidence for a jury to so conclude. (*Id.* at 13–16.) Finally,

Plaintiff contends that he has met his burden to mitigate his damages because he has applied to

numerous institutions, never received an actual offer of employment, and has worked at places

like Home Depot in an effort to mitigate his damages. (*Id.* at 16–18.)

## B. Defendants Are Not Entitled to Summary Judgment on the Retaliation Issue Because a Reasonable Jury Could Conclude that Retaliatory Animus Motivated CNB's Termination of Plaintiff

Courts construe Title VII and the PHRA consistently, so this Court's analysis of Plaintiff's

Title VII claim and his PHRA claims is identical. *Gomez. v Allegheny Health Servs. Inc.*, 71 F.3d

1079, 1083–84 (3d Cir. 1995). Accordingly, if Defendants are entitled to summary judgment on

Plaintiff's Title VII claim, they are likewise entitled to summary judgment on Plaintiff's PHRA

claim.[5]

Title VII of the Civil Rights Act of 1964 provides employees protection from retaliaion

based on their reports of or opposition to unlawful employment practices, or supporting charges

of unlawful employment practices. 42 U.S.C. § 2000e-3(a). Specifically, § 2000e-3 states that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*Id.* In essence, Title VII bars employers from retaliating against workplace whistleblowers.

---

[5] For simplicity, the Court will only refer to Plaintiff's Title VII claim in its analysis.

The familiar *McDonnell-Douglas* framework governs Title VII retaliation claims. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). If the Plaintiff first articulates a *prima facie* case of retaliation, the employer must then come forward with a legitimate, non-retaliatory reason for the discharge. *Id.* (citing *Krouse v. AM. Sterilizer Co.* 126 F.3d 494, 500–01 (3d Cir. 1997)). If the employer produces a legitimate, non-retaliatory reason, the Plaintiff then shoulders the burden of proving that legitimate reason is pretextual, and that retaliation was the true ground for termination. *Krouse*, 126 F.3d at 500–01.

### 1. Plaintiff Has Made Out a Prima Facie Case

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must provide evidence of three things: (1) Plaintiff "engaged in activity" that Title VII protects; (2) CNB "took an adverse employment action" against him; and (3) that there is a "causal connection" between Plaintiff's "participation in the protected activity and the adverse employment action." *Moore*, 461 F.3d at 340–41 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)) (internal quotations omitted).

### a. Plaintiff Has Produced Sufficient Evidence for a Jury to Conclude that He Had a Good Faith Belief that He Opposed Prohibited Employment Practices

Title VII's requirement of "protected activity" covers those who oppose discrimination that Title VII makes unlawful. *Slagle v. Cty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006). The employee must have a good faith, objectively reasonable belief that he or she is opposing activity that Title VII makes unlawful. *Moore*, 461 F.3d at 341; *see Clark Cty. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) (rejecting retaliation claim where "[n]o reasonable person could have believed that [the conduct involved] violated Title VII's standard" for unlawful discrimination).

13

CNB argues that Plaintiff cannot show the first and third elements of his *prima facie* case: a good faith belief that he was opposing employment practices that Title VII prohibits, and a causal connection between any opposition and his termination. (ECF No. 34 at 14–16.) CNB argues that: (1) while Plaintiff alleges that he complained that female lenders were underpaid, those employees did not believe that they were underpaid; (2) Plaintiff admitted he had no salary data upon which to base those complaints; (3) Ms. Peak and Ms. Czyrnik both felt that, Ms. Mowery's behavior notwithstanding, CNB was a good place to work; (4) Plaintiff was unable to provide any specifics regarding the alleged disparate treatment; (5) Plaintiff's complaints of disparate treatment only emerged after CNB began to discuss his subpar performance; and (6) that there is no evidence to substantiate Plaintiff's allegations of disparate treatment. (*Id.*)

Plaintiff responds that the evidence in the record "clearly establishes a *prima facie* case of retaliation." (ECF No. 39 at 9.) Plaintiff contends that he opposed activities which Title VII bars, through his allegations of CNB's underpayment of female lenders, sexual harassment of female employees, and disparate treatment of those same employees. (*Id.* at 9–10.) Plaintiff contends that there is sufficient evidence in the record for a jury to conclude that he has shown he had an objectively reasonable good faith belief that he was opposing prohibited employment practices.

After review, the Court cannot conclude that a reasonable jury would have to find that Plaintiff could not have had a good faith, objectively reasonable belief that he was opposing a prohibited employment practice. As noted above, the vast majority of the evidence in this case is in the form of deposition testimony, and that testimony is likely to be the majority of the evidence presented at trial. In a classic "he said, she said" situation, it is not this Court's role to determine who is and is not correct; who is and is not believable. Credibility is a determination for the

14

factfinder to make, not this Court. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 700 (3d Cir. 1995). Plaintiff testified that he spoke to Bower about sexual harassment, such as staring at female employees and looking down blouses and up skirts, as well as the omission of female employees from company golf outings. (ECF No. 34 ¶¶ 35–37; ECF No. 40 ¶¶ 35–37.) Bower also recalls Plaintiff having some discussion with him regarding unfair treatment of female employees (ECF No. 34 ¶ 41; ECF No. 40 ¶ 41.) Viewing the evidence in the light most favorable to Plaintiff, if the jury were to believe Plaintiff's testimony, they could find that he had a good faith, objectively reasonable belief that he was opposing a prohibited employment practice. Accordingly, the Court holds that Plaintiff has established the first element of his *prima facie* case.

### b. Plaintiff Suffered an Adverse Employment Action

To meet the standard for the second element, Plaintiff need only show that a "reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 341 (quoting *Burlington N & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

CNB does not dispute that Plaintiff suffered an adverse employment action, namely termination. CNB argues only that Plaintiff cannot establish the first and third elements. Accordingly, Plaintiff has established the second element of his *prima facie* case. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

15

### c. A Jury Could Infer A Causal Connection Between Plaintiff's Complaints of Disparate Treatment and Harassment and His Termination

Finally, to establish the third element of a *prima facie* case, Plaintiff must demonstrate a causal connection between his opposition to the unlawful practices and the action that may have "dissuaded a reasonable worker from making or supporting the charge of discrimination." *Moore*, 461 F.3d at 341–42. Ultimately, the question is whether or not CNB had an intent to retaliate. *See id.* at 342.

CNB's evidence in support of its position that Plaintiff cannot establish a causal connection is as follows: (1) prior to Plaintiff's alleged complaints of disparate treatment, CNB had already begun to discuss the poor performance of the Johnstown Office with Plaintiff, the poor performance of his loan portfolio, and his behavior towards the Loan Committee; (2) when Bower asked Plaintiff for specifics so that CNB could investigate, Plaintiff was unable to provide those specifics; and (3) Plaintiff's relationship with Ms. Mowery resulted in serious disruption to the Johnstown Office, as well as the resignation of both Ms. Peak and Ms. Czyrnik. (ECF No. 34 at 15–16.) CNB asserts that no reasonable jury could find that "Plaintiff's unfounded and unsupported claims of unequal treatment had [any] bearing on [CNB's] decision to terminate his employment. (*Id.* at 16.) Rather, Defendants assert that no reasonable jury could find that there was a causal connection between the allegations of disparate treatment and Plaintiff's termination. (*Id.*)

Plaintiff asserts that the fact that CNB terminated him less than one month after his reports of disparate treatment are sufficient to establish a *prima facie* showing of a causal connection between the complaints and his termination. (ECF No. 39 at 10–11.) Plaintiff cites *LeBoon* to

16

suggest that temporal proximity, alone, can create the requisite inference of causality. *See* 503 F.3d at 232. Plaintiff also asserts that, because CNB's Loan Committee had to approve and underwrite loans of a certain size before they could issue, the claim that CNB terminated Plaintiff because he did not follow CNB's lending philosophy must be pretextual.

In considering the existence of the requisite causal connection, this Court considers "a broad array of evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). Where the "temporal proximity" between the allegedly protected activity and the adverse employment action is "unusually suggestive," the jury may infer the required causal connection, and in such a case, summary judgment is improper. *LeBoon*, 503 F.3d at 232. However, when the temporal proximity is not "unusually suggestive," this Court must determine if the Plaintiff's evidence, looked at as a whole, is sufficient to raise the inference." *Farrell*, 206 F.3d at 280. The kinds of evidence which may suffice include "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon*, 503 F.3d at 232. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252 . There are effectively no limits on what this evidence can or cannot be. *See Farrell*, 206 F.3d at 280–81.

Here, Plaintiff's evidence is sufficient to permit a reasonable jury to infer a causal connection between his reporting of sexual harassment and disparate treatment and his termination. Plaintiff's performance was strong in many respects, and he was in charge of one of CNB's largest loan portfolios. (ECF No. 40 ¶¶ 106–107; ECF No. 44 ¶¶ 106–107.) Large loans

17

needed to be approved by the Loan Committee (of which Bower was a member), and CNB's analysts underwrote every loan. (ECF No. 34 ¶¶ 15–17; ECF No. 40 ¶¶ 15–17.) Accordingly, a jury could believe that each of the loans for which Bower criticized Plaintiff for making were approved, either by Bower himself or CNB as a whole. Coupled with Plaintiff's testimony that he had spoken with Bower and CNB's management about disparate treatment, a jury could find a causal connection between Plaintiff's complaints and his termination. (*See, e.g.*, ECF No. 34 ¶ 37; ECF No. 40 ¶ 37.)

Plaintiff has made out a *prima facie* case of retaliation, and this Court will now proceed to address Defendants' other arguments as to why it should grant CNB summary judgment.

## 2. Defendant Has Advanced a Legitimate, Non-discriminatory Reason for Plaintiff's Termination

Defendant claims it terminated Plaintiff solely for legitimate, non-discriminatory reasons, specifically citing performance deficiencies, insubordination, and the state of the Johnstown Office. (ECF No. 33 at 17.) Given the evidence presented, a reasonable jury could conclude that CNB had legitimate, non-discriminatory grounds to terminate Plaintiff. The burden accordingly shifts back to Plaintiff to show that a reasonable jury could find those reasons pretextual.

## 3. Plaintiff Has Shown that His Termination Could Have Been Pretextual

Once the burden returns to the Plaintiff under *McDonnell-Douglas*, to survive a motion for summary judgment, Plaintiff must produce evidence "from which a jury could reasonably" conclude that the claimed reason for termination is pretextual. *Moore*, 461 F.3d at 342. This is not a preponderance of the evidence; all that is required is some "evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated." *Fuentes v.*

18

*Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). However, Plaintiff must produce evidence that all of the offered reasons are pretextual, not merely one. *Vescera v. DRS Laurel Techs.*, No. 3:11-cv-122, 2013 WL 1102910, at *8 (W.D. Pa. Mar. 15, 2013). As this Court noted in *Vescera*, that evidence can be in the form of "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find [unworthy] of credence.'" *Id.* (quoting *Fuentes*, 32 F.3d at 764). Evidence that serves to establish a *prima facie* case can also serve to show pretext. *Fuentes*, 32 F.3d at 765.

CNB asserts that it had no retaliatory animus for terminating Plaintiff. CNB argues that its termination of Plaintiff was legitimate because: (1) Plaintiff failed to follow directives associated with a shifting lending philosophy; (2) the quality of Plaintiff's loan portfolio decreased over time, specifically, the Johnstown Office failed to meet its production goals in the last "couple years" of Plaintiff's management and Plaintiff's loans had resulted in several million dollars' worth of charge-offs; (3) Plaintiff held back information about loan applicants; and (4) Plaintiff remained in contact with customers in default in disregard of CNB's directions to the contrary. (ECF No. 33 at 16–19.)

Plaintiff responds that CNB's proffered rationales are pretextual because: (1) the Johnstown Office had one of CNB's largest portfolios; (2) the Johnstown Office failed to meet its production goals because those goals included wealth and asset business, as well as trust business, which was business the Johnstown Office could not do because it was solely a lending office; and (3) that any loan change philosophy that may have occurred is irrelevant because the Loan Committee needed to approve all large loans and CNB's credit department underwrote

19

every loan, large or small, so any loans Plaintiff made that might have been in contravention of the new lending philosophy were ratified by CNB. (ECF No. 39 at 13–16.)

Addressing each of CNB's asserted rationales, there is a dispute of material fact regarding the reasons behind Plaintiff's termination. A jury could reasonably conclude that a retaliatory animus drove CNB's determination to terminate Plaintiff.

It is not this Court's place, in deciding a motion for summary judgment, to sit in judgment of and weigh the evidence. Credibility determinations are the province of the jury. *Anderson*, 477 U.S. at 255. Given that the vast majority of the evidence presented in this case is in the form of highly disputed deposition testimony, the Court cannot look at the evidence and definitively state that there is no "genuine dispute as to any material fact and [that Defendants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court will address each of CNB's proffered reasons in turn.

First, with respect to CNB's argument that it terminated Plaintiff for performance deficiencies, Plaintiff has provided evidence from which a reasonable jury could conclude that his performance was satisfactory, and that termination would not be justified on those grounds. It is undisputed that Plaintff's loan portfolio was initially "very good" in quality, but the parties dispute whether it eventually declined, as well as whether the portfolio ended up requiring several million dollars' worth of charge-offs. (ECF No. 34 ¶¶ 22–23; ECF No. 40 ¶¶ 22–23.) If the jury chooses to believe Plaintiff's testimony, they could reasonably find that Plaintiff had no performance deficiencies.

Second, there is a similar dispute with Plaintiff's alleged deficiencies in meeting his production goals. The testimony indicates that those goals included wealth management and

20

trust business, which the Johnstown Office, being only a lending office, could not possibly meet. (ECF No. 34 ¶ 4; ECF No. 40 ¶ 4.) A jury could reasonably conclude that CNB's proffered rationale of failure to meet production goals was pretextual.

Third, Plaintiff's testimony that CNB's credit department underwrote every loan, and that the Loan Committee needed to approve particularly large loans would provide a reasonable jury a foundation to conclude that CNB's position that it terminated Plaintiff for failure to follow CNB's lending philosophy was pretextual. (ECF No. 34 ¶¶ 15–17; ECF No. 40 ¶¶ 15–17.)

Fourth, CNB's argument that Plaintiff was insubordinate and failed to communicate information about loan applicants is also likewise disputed. (*See* ECF. No. 34 ¶¶ 30–31; ECF No. 40; ¶¶ 30–31.) Plaintiff disputed that Bower ever told him that his loan presentations suffered, or that he ever admitted to holding back client information. (ECF. No. 34 ¶¶ 30–31; ECF No. 40; ¶¶ 30–31.) Additionally, CNB has not identified what information Plaintiff allegedly withheld and what effect that information, if given, would have had on the credit granting process.

Fifth, with respect to CNB's argument that it terminated Plaintiff for turmoil in the Johnstown Office caused by Plaintiff's relationship with Ms. Mowery, Plaintiff has produced enough evidence that a reasonable jury could conclude that that reason was pretextual. Ms. Peak and Ms. Czyrnik both stated that, apart from Plaintiff's relationship with Ms. Mowery, the Johnstown Office was a good place to work, and a reasonable jury could conclude that there was not "turmoil" in the office. (*See* ECF No. 34 ¶¶ 47–48; ECF No. 40 ¶¶ 47–48.)

Accordingly, for the forgoing reasons, the Court denies summary judgment on the issue of whether CNB terminated Plaintiff with retaliatory intent. There are sufficient disputes of material fact to preclude a grant of summary judgment in CNB's favor.

21

## C. Defendants Are Not Entitled to Summary Judgment on the Issue of Plaintiff's Failure to Mitigate Damages Because A Jury Could Find that Plaintiff Acted Reasonably to Mitigate His Damages

CNB claims that it is entitled to a grant of summary judgment on Plaintiff's wage loss claim because he failed to mitigate his damages by not accepting a similar job with another bank.

All Title VII claimants are subject to a statutory duty to minimize damages. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). The duty requires Plaintiff to exert "reasonable diligence in finding other suitable employment." *Id.* While Plaintiff bears the burden to mitigate his damages, CNB has the obligation to prove that Plaintiff failed to meet this burden. *See Robinson v. SE Pa. Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 897 (3d Cir. 1993). Essentially, a claim that a plaintiff has failed to mitigate his damages is an affirmative defense, and on that affirmative defense, the defendant carries the burden of proof. *Anastasio v. Schering Corp.*, 838 F.2d 701, 707–08 (3d Cir. 1998). To carry this burden, CNB must show two things: (1) Plaintiff had "substantially equivalent" work available; and (2) Plaintiff failed to exercise "reasonable diligence" to obtain that employment. *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995). Determining if a plaintiff has satisfied his duty to mitigate his damages is one of fact for the jury. *Id.* The moving party's burden of proof is high, and to prevail, the movant must show, beyond doubt, each element necessary. *See Stager v. Beverly Health and Rehab. Servs., Inc.*, No. 3:06-cv-101, 2008 WL 3165837, at *19 (W.D. Pa. Aug. 6, 2008) (citing *Booker*, 64 F.3d at 864; *Nat'l St. Bank v. Fed. Reserve Bank*, 979 F.2d 1579. 1582 (3d Cir. 1992); *Chaplin v. Nationscredit Corp.* 307 F.3d 368, 372 (5th Cir. 2002)).

CNB asserts that, within two months of his termination from CNB, Somerset Trust offered him a position as Vice President of Commercial Lending, and that he rejected the offer. (ECF No.

34 at 23.) CNB also argues that, had Plaintiff accepted the offer, he would have made somewhere between $200,000 and $250,000 annually. (*Id.*) CNB maintains that, because Plaintiff declined to accept the job, it has met its burden of proving that Plaintiff failed to mitigate his damages and is accordingly entitled to summary judgment on Plaintiff's wage loss claim. (*Id.*)

Plaintiff responds that CNB has not met its burden. Plaintiff advances several arguments for his position, and argues that CNB mischaracterizes the record. Plaintiff argues the following: (1) within two weeks of his termination from CNB, plaintiff began looking for work, and within two months obtained an interview; (2) Plaintiff applied to somewhere between 150–200 positions; (3) interviewed at several financial institutions, including Somerset Trust, Chase Manhattan, NexTier Bank, a "large bank in Pittsburgh," and First National Bank in Pittsburgh; (4) while Plaintiff and Somerset Trust discussed employment, Somerset Trust never offered Plaintiff the position, the parties agreed that employment would not work, and the negotiations "fell through;" and (5) because Plaintiff has been unable to obtain employment in the financial arena, he has attempted to mitigate his damages by working for Home Depot, where he earns a few dollars per hour above minimum wage. (ECF No. 39 at 16–18; *see* ECF No. 41-1 at 127:1–134:9.)

In his deposition, Plaintiff testified extensively about his interactions and negotiations with Somerset Trust, and the Court will review that testimony in-depth here.[6] Within two months of his termination, Plaintiff had an interview with Somerset Trust. (ECF No. 35-1 at 118:23–25.) Somerset Trust "offered" Plaintiff a position as Vice President of Commercial Lending. (*Id.* at 119:4–9.) Plaintiff decided not to accept the position because both parties "agreed that it wasn't

---

[6] Both Parties included portions of Plaintiff's deposition testimony in their respective statements of material facts. CNB included more of the instantly relevant testimony, so the Court will cite that document, ECF No. 35-1, rather than Plaintiff's, ECF No. 41-1.

23

going to work." (*Id.* at 119:10–12.) Somerset Trust's alleged offer included both a salary and a commission, and involved moving Plaintiff's loan portfolio at CNB to Somerset Trust, though Plaintiff was concerned that this arrangement might ultimately reduce his income. (*Id.* at 119:13–120:6.) Plaintiff spoke with at least three employees of Somerset Trust about the position, including Henry Cook, the Chairman of the Board, and Mr. Cook's two brothers who co-own the bank. (*Id.* at 120:7–12.) Somerset Trust has several locations, and their alleged offer never specified a particular office from which Plaintiff would work. (*Id.* at 120:20–121:6.) Somerset Trust never specified a place of employment because the negotiations "never got to that point," and Somerset Trust never extended a formal, written offer. (*Id.* at 121:7–14.)

Mr. Cook did, however, extend a verbal offer, saying that he wanted Plaintiff to "start that day," but stated that he needed to clear the offer with his brothers, the co-owners. (*Id.* at 121:15–22.) When Mr. Cook's brothers became involved, discussions about compensation began, and Plaintiff was concerned that he would "be making way too much money," which is "one thing in banking you can't do," making Plaintiff concerned that he would not be retained at Somerset Trust, or Somerset Trust would reduce his compensation. (*Id.* at 121:22–122:7.) Plaintiff estimated that, based on the commission scale that Somerset Trust offered, he could make $200,000 to $250,000 annually, but feared that this would lead to him being "cut back," and having his commission structure reduced, based on his past employment history, because "what they give you, then can take away real quick." (*Id.* at 122:8–16; 123:2–6.) Plaintiff declined to further negotiate with Somerset Trust because he felt he "could get a job anywhere," based on his "great reputation." (*Id.* at 122:17–23.) Plaintiff testified, however that Somerset extended an offer based "primarily" on commission, and that he believed that within two years, he would be making as

24

much as Somerset Trust's President, something that the banks "don't allow." (*Id.* at 124:20–125:12.) Plaintiff then testified that he "countered" Somerset Trust's alleged offer, and then their discussions "fell though." (*Id.* at 125:18–25.) There is no evidence that either party ever deposed Mr. Cook, or any other members of Somerset Trust involved in the alleged offer.

After reviewing the evidence, the Court cannot say that CNB has proven beyond all doubt each element of its burden, that Plaintiff had "substantially equivalent employment available, and that Plaintiff failed to exercise "reasonable diligence" to obtain such employment. *Ford Motor Co.*, 458 U.S. at 231. Plaintiff applied broadly and had several interviews. (*See* ECF No. 41-1 at 127:1–134:9.) Plaintiff has also worked jobs not related to lending in an effort to mitigate his damages. (ECF No. 41-1 at 134:19–135:12.) Based on the evidence before the Court, the Court cannot say that a reasonable jury would have to conclude that Plaintiff failed to mitigate his damages. Accordingly, the Court will deny CNB's Motion for Summary Judgment on the wage loss issue.

## VII. Conclusion

For the forgoing reasons, the Court will grant CNB's Motion for Summary Judgment in part and deny it in part. An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT S. BEREZANSKY,** | ) | **Case No. 3:17-cv-105** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CNB BANK AND CNB FINANCIAL** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

**NOW**, this $\underline{30^{th}}$ day of September, 2019, upon consideration of Defendants CNB Bank and CNB Financial Corporation's Motion for Summary Judgment (ECF No. 32), and for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that said Motion is **GRANTED IN PART** and **DENIED IN PART**. Count III of Plaintiff's Complaint (Age Discrimination in violation of the Age Discrimination and Employment Act of 1967) is dismissed with prejudice. In all other respects, Defendants' Motion is **DENIED**.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**